UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TONY G. PEPPERS, | |
|     Plaintiff, | CIVIL ACTION NO. |
| v. | 1:11-CV-4195-CAP |
| ESTES HEATING AND AIR CONDITIONING, INC., | |
|     Defendant. | |

**O R D E R**

This matter is before the court on the defendant's motion for sanctions [Doc. No. 48] and bill of costs [Doc. No. 68]. The court will also address the defendant's request for attorney's fees in its motion for summary judgment [Doc. No. 46].

I.  **Factual and Procedural Background**

On December 1, 2011, the plaintiff brought this action under the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008 ("the ADAAA"), alleging that Estes Heating and Air Conditioning, Inc., ("Estes") terminated him because of a perceived disability in violation of 42 U.S.C. § 12102(1)(C) (Count I) or, in the alternative, an actual disability in violation of 42 U.S.C. § 12102(1)(A) (Count II).

From February 16, 2009 until August 4, 2010, Tony G. Peppers worked as a residential service technician for Estes. In April 2010, Peppers suffered a congestive heart failure and was hospitalized. Afterwards, he was absent from work until approximately May 12, 2010. On August 3, 2010, Estes employees received a phone call from an anonymous person who reported seeing a driver in an Estes van using methamphetamine next to a Waffle House and later purchasing drug paraphernalia from a nearby store called The Love Shack. Estes supervisor, Joel Heller, cross-checked the locations the caller reported with Estes' GPS tracking data for the company's vans and determined that Peppers had been assigned to the van the caller reported seeing. The addresses listed on the GPS report for Peppers's van for August 3 confirmed that the van had been parked next to a Waffle House and had visited The Love Shack. The GPS report also indicated that the van had traveled outside of Peppers's installation and repair territory that day to the address 2688 Beeler Dr. SW, Atlanta, Georgia, an apparent violation of company policy.

On August 4, 2010, Heller called Peppers into the Estes conference room to discuss the report from the caller. Estes's human resources manager, Michelle Smith, also attended. Heller told Peppers what the caller had reported seeing and presented Peppers with the GPS investigation. Peppers

denied using any drugs. Nevertheless, he admitted that he had visited The Love Shack during working hours on August 3. He claimed the visit was to buy something for his wife, not to purchase drug paraphernalia. In addition, he claimed that his out-of-territory stop was at his father's house, a stop that would have been within Estes's permissible non-work related stops. At summary judgment the parties disputed what happened next and how these events led to Peppers no longer being employed at Estes.

     Estes alleged that during the meeting Heller told Peppers that he would be subjected to a drug test and suspended immediately pending the outcome of the test. Estes states that Heller then drove Peppers to a drug testing agency. On the way there, however, Estes alleged that Peppers admitted that a drug test would show the presence of marijuana in his system. Heller testified that after this alleged admission, he pulled the car to side of the road and called Smith at Estes's office. Then, Smith and Heller allegedly decided to offer Peppers the options of resigning or proceeding with the drug test, telling him that he would be terminated if the test was positive for the presence of drugs. Estes alleged that Peppers then voluntarily resigned by writing and signing a resignation letter on the back of the GPS data report. A handwriting expert and two people familiar with Peppers's handwriting subsequently testified that the signature and date on the

resignation letter are Peppers's handwriting. In addition, Estes alleged that another Estes employee, Byron Brown, drove Peppers home after his resignation. Brown stated in an affidavit that during this drive Peppers told him that he had resigned rather than take a drug test because he would have tested positive for marijuana.

Peppers denied that Estes's version of events actually occurred. He alleged that during the meeting with Heller and Smith on August 4, 2010, he requested a drug screen and that Heller began to drive him to a drug-testing clinic. Peppers alleged that instead of driving Peppers to the clinic, Heller pulled the tuck over and told Peppers that he was being fired for drug use. Peppers testified that he was never offered the option to resign. When shown his alleged signature on the resignation letter in question, Peppers testified that it was not his signature and that he did not write the letter. In addition, Peppers testified that the alleged conversation with Brown never occurred.

After being terminated, Peppers retained his counsel in this case, Jack Rosenberg. On September, 22, 2010, Rosenberg filed a claim for unemployment benefits on Peppers's behalf with the Georgia Department of Labor. In that claim, Peppers stated that while he was told he was terminated for drug use, he believed the real reason was his refusal to follow

what he thought was an illegal direction from Heller to disconnect a customer's air conditioning unit.

On December 31, 2010, Rosenberg filed a charge against Estes on Peppers's behalf of discrimination because of an actual or perceived disability with the Equal Employment Opportunity Commission ("the EEOC"). Estes responded to this charge, detailing its defenses and factual contentions. On September 1, 2011, the EEOC dismissed the charge stating that the information it obtained during its investigation did not indicate that Peppers had been discriminated against. The EEOC sent Peppers a right-to-sue notice, and he filed this suit on December 2, 2011, within 90 days of receiving the notice.

On February 27, 2012, before discovery began, counsel for Estes sent Rosenberg Estes's business records detailing the call report from August 3, 2010, the GPS data Heller reviewed, and photographs taken verifying the locations of the Waffle House and The Love Shack. On April 30, 2012, Rosenberg returned his client's responses to Estes's first set of interrogatories. In these responses, Peppers admitted that he was not substantially limited in any major life activities at the time of his termination (a required element for a claim for actual discrimination under the ADAAA) and stated that his father's address was 210 Rhodesia Avenue, Lakewood,

GA, which is at least 3 miles from where the GPS report indicated Peppers had traveled when he claimed he was visiting his father.

On July 10, 2012, counsel for Estes's sent Rosenberg a copy of the Final Disposition in a felony cocaine possession conviction against Peppers. This revealed that Peppers had lied on his job application with Estes when he indicated that his prior criminal conviction was only for a misdemeanor. On July, 26, 2012, Estes submitted an offer of judgment to Rosenberg in the amount of $2,500. Rosenberg did not respond to this offer.

The original discovery deadline in this case was September 7, 2012. Rosenberg did not conduct any discovery before that deadline passed. He requested and received a 90-day extension of discovery from this deadline but did not conduct any discovery until the last day of the new period, December 3, 2012. Discovery closed and Estes filed a motion for summary judgment on December 12, 2012, and the instant motion for sanctions on January 8, 2013. Rosenberg did not file a response to either motion but instead filed another motion for an extension of time to complete discovery and a motion for an extension of time to respond to Estes's motions. The court held a hearing on these various motions and set out a new timeline for discovery and responses. The parties complied with this new timeline, and the court granted Estes's

motion for summary judgment on June 28, 2013, dismissing all of Peppers's claims.

## II.  The Defendant's Motion for Sanctions

The defendant has moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure, or, in the alternative, pursuant to 28 U.S.C. § 1927.

### A. Rule 11 Sanctions

Rule 11 gives the court the power to impose appropriate sanctions on a party for presenting an improper pleading, motion, or other paper. "The standard for testing conduct under [Rule 11] is the objective standard of 'reasonableness under the circumstances.'" *Aetna Ins. Co. v. Meeker*, 953 F.2d 1328, 1331 (11th Cir. 1992) (quoting *U.S. v. Milam*, 855 F.2d 739, 743 (11th Cir. 1998). The objective standard requires the court "to evaluate whether the motion, pleading or other paper reflected what could reasonably have been believed by the signer at the time of signing." *Didie v. Howesi*, 988 F.2d 1097, 1104 (11th Cir. 1993). Here, the relevant standard of reasonableness is whether Rosenberg's conduct indicates "deliberate indifference to obvious facts." *See Davis v. Carl*, 906 F2d 533, 537 (11th Cir. 1990).

The defendant argues that Rosenberg could not have reasonably believed the allegations in the complaint when he initially filed this lawsuit

7

on his client's behalf. Nevertheless, the only evidence the defendant can point to that purportedly shows Rosenberg's deliberate indifference to obvious facts either came directly from the defendant or directly contradicts what Rosenberg says he was being told by his own client. The court is unwilling to conclude that Rosenberg had to accept this evidence as true and discount his own client's account of what occurred prior to filing this lawsuit and getting the opportunity to conduct discovery. Thus, the court finds that Rosenberg's actions in filing the complaint in this lawsuit did not rise to the level of objective unreasonableness; therefore, the defendant's motion for Rule 11 sanctions is DENIED.

### B. 28 U.S.C. § 1927 Sanctions

28 U.S.C. 1927 allows for sanctions against an attorney for conduct committed during the course of litigation:

> An attorney or other person admitted to conduct cases in any court of the United State or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs and attorney's fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. The party requesting sanctions pursuant to § 1927 must satisfy each of the three elements of the statute: (1) the attorney engaged in unreasonable and vexatious conduct, (2) the conduct multiplied the

proceedings, and (3) the amount of the sanction requested does not exceed the costs incurred due to the unreasonable conduct. *See Conner v. BCC Financial Management Services, Inc.*, 597 F. Supp. 2d 1299, 1305 (S.D. Fla. 2008). "Bad faith is the touchstone [of § 1927 sanctions], not mere negligence." *Id.* "A determination of bad faith is proper where an attorney knowingly or recklessly pursues a frivolous claim . . . ." *Id.*

Here, the defendant argues that a reasonable attorney would have dismissed this case at various stages of litigation and that Rosenberg's failure to do so was unreasonable and vexatious. The defendant identifies three specific dates after which it argues, each in the alternative, Rosenberg had a duty to dismiss this case.

The first date is February 27, 2012, before discovery began, when the defense counsel sent Rosenberg Estes's business records detailing the call report from August 3, 2010, the GPS data Heller reviewed, and photographs taken verifying the locations of the Waffle House and The Love Shack. The second date is July 10, 2012, when the defense counsel sent Rosenberg the affidavit of Shalanda Lane, which revealed that someone other than Heller spoke to the alleged caller on the day in question; before July 10, Rosenberg had been arguing that Heller had concocted the story about the phone call. On July 10, 2012, the defense counsel also sent Rosenberg a copy of the Final

Disposition in a felony cocaine possession conviction against Peppers. This revealed that the plaintiff had lied on his job application with Estes when he indicated that his prior criminal conviction was only for a misdemeanor. The final date is August 9, 2012, when the defendant produced an expert report concluding that the plaintiff's purported resignation letter bore the plaintiff's signature; Rosenberg did not produce an expert report in response.

The court disagrees with the defendant's contention that Rosenberg's failure to dismiss this case after each of these dates was unreasonable and vexatious. The information Rosenberg received on February 27, 2012 came directly from the defendant, and the court is unwilling to conclude that Rosenberg had to accept this evidence as true prior to discovery. The affidavit from Lane and criminal report Rosenberg received on July 10, 2012 also do not support the defendant's argument that Rosenberg acted in bad faith by not dismissing the case. The affidavit merely contained testimony from one of Heller's subordinates at Estes, which Rosenberg was not required to believe, and the arrest report does not prove that his client was not telling the truth about why he was allegedly fired. Finally, the expert report the defendant produced on August 9, 2012 supported its claim that the plaintiff signed the resignation letter, but it was not legally dispositive on the question of whether the plaintiff had in fact resigned.

Based on the foregoing, the court concludes that the defendant has not met its burden of showing that Rosenberg acted unreasonably and vexatiously in not dismissing this case and that his conduct rose to the level bad faith. Accordingly, the defendant's motion for § 1927 sanctions is DENIED.

### III. The Defendant's Request for Attorney's Fees in its Motion for Summary Judgment

The defendant requested recovery of its attorney's fees pursuant to the ADAAA's fee-shifting provision, 42 U.S.C. § 12205. Section 12205 permits the prevailing defendant in an ADAAA case to recover attorney's fees

#### A. Legal Standard

In an ADA civil rights case, the "plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1176 (11th Cir. 2005). The question for the district court is "whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Sullivan v. Sch. Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1189 (11th Cir. 1985). Cases in which an award against the plaintiff have been sustained are those in which the plaintiff failed to

11

introduce any evidence to support his claims. *See Cordoba*, 419 F.3d at 1176. In addition, the court in *Sullivan* introduced three factors that can serve as a guide for the court's analysis: "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." *Sullivan*, 773 F.2d at 1189. "The *Sullivan* factors, however, are 'general guidelines only, not hard and fast rules,' and '[d]eterminations regarding frivolity are to be made on a case-by-case basis.'" *Cordoba*, 419 F.3d at 1177 (quoting *Sullivan*, 773 F.2d at 1189).

**B. Analysis**

Here, the defendant argued in its motion for summary judgment the following reasons for granting it attorney's fees under § 12205: the plaintiff had not established a prima facie case, had presented no facts supporting its claims, and had conceded in a footnote in his response to the defendant's motion for summary judgment that his claim for actual discrimination was groundless. The court granted the defendant's motion for summary judgment but found that the plaintiff had presented sufficient facts to establish a prima facie case. Furthermore, the plaintiff only stated that he was no longer pursuing his actual discrimination claim; he did not concede that it was groundless.

Two factors weigh in the defendant's favor. First, the defendant did make an offer to settle, and second, the court did dismiss the plaintiff's case prior to trial. Nevertheless, the court concludes that these two factors alone are insufficient to show that the "case is so lacking in arguable merit as to be groundless or without foundation." *Sullivan*, 773 F.2d at 1189. This is especially true given the court's determinations in parts II.A and II.B *supra* that the plaintiff's counsel's actions were not sanctionable. Thus, the court concludes that the defendant is not entitled to attorney's fees pursuant to § 12205 and its request for attorney's fees is DENIED.

### IV.    The Defendant's Bill of Costs

After the court entered judgment in the defendant's favor, the defendant filed a bill of costs pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure for costs totaling $2,825.35 [Doc. No. 68]. The plaintiff filed objections to the bill of costs and requests that the court reduce the total by $1,893.80. The objections cover seven items in the bill of costs: (1) $382.60 for serving a subpoena on Steve Ritchie; (2) $896.95 for transcripts of the depositions of Heller and Lane; (3) $80.44 for postage; (4) $387.63 for photocopies; (5) $51.80 for overnight express courier; (6) $92.60 for certified court record copies; and (7) $2.50 for filings fees. The defendant filed a response to these objections [Doc. No. 75].

13

As an initial matter, the defendant concedes that the costs it requested for (3) postage, (4) photocopies, (5) overnight express courier, and (7) filing fees should be excluded. As such, those items will be deducted from the bill of costs and the total will be reduced by $522.37.

**A. Serving a Subpoena on Steve Ritchie**

Steve Ritchie was the plaintiff's supervisor at his previous place of employment, Metro Mechanical. The plaintiff objects to the cost of serving Ritchie by arguing, "There is no basis in either Rule 54 or 28 U.S.C. § 1920 for the recovery of the expense of serving a subpoena" [Doc. No. 73] at 4. The plaintiff also argues that the materials the defendant obtained from Ritchie were not used in this case and therefore were not necessary to the case.

The Eleventh Circuit has held that "private process server fees may be taxed pursuant to §§ 1920(1) and 1921." *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 624 (11th Cir. 2000). The fees must "not exceed the statutory fees authorized in § 1921." *Id.* Here, the defendant's request for $382.60 to serve Ritchie includes the cost of the process server having to make two attempts to successfully serve Ritchie. The court finds that this amount is within the statutory fees authorized by § 1921. In addition, while the materials obtained from Ritchie may not have played a significant role in the defendant's motion for summary judgment, it was reasonable for the defendant to believe that

information about the plaintiff's prior employment would be necessary to defend a wrongful termination employment suit. As such, the court overrules the plaintiff's objections to the cost of serving a subpoena on Ritchie.

### B. Transcripts of the Depositions of Heller and Lane

Heller and Lane were the defendant's employees at the same time as the plaintiff and were materially connected to the incident that formed the basis of the plaintiff's wrongful termination suit. The plaintiff took Heller's and Lane's depositions and each party utilized the depositions in their briefs on the defendant's motion for summary judgment. The plaintiff now argues that the defendant purchased copies of these depositions merely for its own convenience, and, therefore, the cost of the copies should be excluded.

"The question of whether the costs for a deposition are taxable depends on the factual question of whether the deposition was wholly or partially necessarily obtained for use in the case." *Id*. Here, Heller's and Lane's depositions were an integral part of the defendant's motion for summary judgment, the plaintiff's brief in response, and the defendant's reply brief. Accordingly, the plaintiff's objection to these costs is overruled, and the court finds that the defendant can recover the costs of obtaining transcripts of these depositions.

**C. Certified Court Record Copies**

Courts may award costs for "[f]ees for exemplification and copies of papers necessarily obtained for use in the case." 28 U.S.C. § 1920(4). The plaintiff argues that the defendant has failed to itemize these expenses or otherwise justify why they were necessary. In response, the defendant states that $51.50 of the requested $92.60 for certified court record copies came from the cost of obtaining the plaintiff's unemployment records from the Georgia Department of Labor. The defendant used these records in support of its motion for summary judgment. The defendant has now supplied a letter from the Georgia Department of Labor to counsel for the defendant requiring a total payment of $51.60 for obtaining these records.

The court finds that these records were necessarily obtained for use in the case and that the defendant has adequately justified this cost. As such, the plaintiff's objection is overruled as to $51.60 of the cost of certified court record copies. The defendant has withdrawn its request for the remaining $41.10.

**V.  Conclusion**

Based on the foregoing, the defendant's motion for sanctions [Doc. No. 48] is DENIED and the defendant's request for attorney's fees in its motion

for summary judgment [Doc. No. 46] is DENIED. The defendant is awarded costs pursuant to its bill of costs [Doc. No. 68] in the amount of $2261.88.

**SO ORDERED** this  25th  day of September, 2013.

>/s/Charles A. Pannell, Jr.
>CHARLES A. PANNELL, JR.
>United States District Judge